Natalie Koss, Attorney for Appellant Ramona Rae Gomez, and I'm joined by my co-counsel Ryan Posey. Your Honor, Your Honors, we have appealed two rulings, two opinions from the district court. One, we contend that the district court committed clear error when it ignored the plaintiff, Ms. Gomez's, arguments of pretext in the opinion and the judgment, granting summary judgment on all counts. We also have appealed the court's opinion, arguing that the court committed clear error in granting all but one of defendants' motions in limine. We believe that the court, the district court, had failed to consider the facts and credit Most of the evidence presented by Plaintiff Gomez and also disregarded precedent out of this court in evaluating and dismissing the claims. I'd like to start with the motions in limine. The court had granted all but one of the motions in limine. Which I'll review as abuse of discretion. Abuse of discretion, Your Honor. And we think that the court, essentially, we don't think, we know that the court only Did you comply with the scheduling order? We complied with the scheduling order in identifying those witnesses in the initial disclosures. What about these witnesses? So when these witnesses were disclosed. Because that's the issue. So this is the issue. I didn't ask you about the ones you actually did disclose. I'm talking about these witnesses. On the last day of discovery, we amended our initial disclosures to include witnesses and additional fact information. When did you know about those witnesses? We knew about some of the witnesses when the defendants had complied with the court order compelling discovery. So when the court had ordered the defendants to produce the I guess my question is, didn't you know about many of these witnesses well before the very last day of discovery? We did, Your Honor. And the way, the practical aspect of it was there was a very protracted, very, I'm sorry, short period, a window. So the court had granted the motion to compel to June 9th. The defendants had produced a list of other acts witnesses June 21st. When we got the supplemental discovery, we were in the midst of deposing the defendants' witnesses. Now, the court said that that was too late. However, this goes against Bressler as well as the advisory committee notes for Rule 26, which essentially says in some substance, you don't need to tell the other side what they already know essentially, which is these were witnesses that the defendants knew about. So how did the Southern States factors exclude them from being disclosed on the last day of discovery? If the Southern States factors are being properly applied here, which we don't believe they were, there was no surprise to the other side. There was no disruption to the trial. There was no, there was the ability to cure the surprise because there was no surprise, Your Honors. What was this evidence being offered for? It was other acts witnesses, Your Honor. There were other women. There was one man. This was for what claim? For the FMLA and disability claim, Your Honor. So the court actually denied one of the motions in Lemonnier related to Courtney Davis, stating that Courtney Davis was in fact already known to the defendants at the time the initial disclosures were updated on the last day of discovery. So the court took notice of that, but just for her. As to the other individuals that were on our witness list, the court did not credit the All of that information, the other acts evidence, were employees of the employer. Their employees of the employer, they knew full well who these individuals were. They absolutely had personnel files. In fact, the employer here, Haystacks and Eccentrics, knew more about the facts of these witnesses than we did because they had the personnel files. Interestingly, when the defendants filed their motions in Lemonnier on each of these witnesses, they provided very full and robust personnel records that we never even got through discovery when they had a court order compelling them to produce it. And that only came well after the close of discovery, Your Honors. I want to quote to Bressler, which was out of this court in 2017, while they had a court order compelling them to produce something, and what do you do when they didn't produce it? Okay. We just kind of have a little remedy there for you, don't we? Right. So we exercise it? So we... So... Excellent question, Your Honor. Thank you. The court's not... We give an order, a court give an order, it has a reason, and you got a little teeth there. Well, what'd you do with that order when the court ordered them, compelled them to do it? Compelled them to do it, Your Honor. I suppose you jumped up with a big motion, didn't you? Compelled to do it, and then we, the court was very clear that he wanted us to work it out amongst ourselves. And so we, I tried to do that, I certainly did. We sent a deficiency letter. In fact, on June 21st, when the defendants supplemented their responses... Compelling to produce, and you got to work it out among yourselves, a little different thing. And we sent another deficiency letter saying, thank you for the list of the other witnesses, the employee's witnesses, but we would also like to have their contact information. I thought that was an easy request to supply to the opposing party, but apparently it was not, and we didn't get that information until my client, Ms. Gomez, was deposed for two days. And this relates to the exclusion of the evidence on a motion in Lemonade House? Well, because, Your Honor, the court had said that there was no substantial justification for the failing to disclose witnesses on the last day of discovery. That's the court saying there's no substantial justification. Did you know their names? Yes. Why did you need the contact information? Because there were dead people on the list, Your Honor. And we wanted to make sure that we weren't putting deceased individuals on a witness list. What would have happened had you done that? Nothing. It wouldn't have shown up, would it? No, Your Honor. So what's the big deal? Well, I think we wanted to contact the witnesses before we placed them on a witness list. Yeah, but this is a scheduling order. The purpose is to be able to put these witnesses up so that you will have adequate time to do that very thing, discovery, and the question, and the whole bit. And it's a discretionary thing on the part of this judge now. I mean, he could have gone one way or the other on it, but the question is, is it an abuse of discretion for you to come up on the very last day and says, okay, here we go. What's that going to do to the process? The judge says, oh, no. Well, I think... Well, you frowned as though he didn't do that. Did he do something different? Well, I think the court... It was the last day, wasn't it? Well, it was the last day, but again, the defendants were fully knowledgeable about the facts of these witnesses. Keep in mind, Your Honor, Susan Brady, the Vice President of Human Resources, was deposed quite a bit about each of the individuals on this list. To your point, there was no prejudice to this? Absolutely there was no prejudice, Your Honor. And also, they brought it on themselves by not going forward and doing what the court ordered. Yes, Your Honor. But the hammer fell on you. Yes, Your Honor. Okay. That's a short way of putting it, but you said the court told you to work it out. It wasn't quite an order to compel. There was something going on there that wasn't working out. Right, and I agree, Your Honor. The court... But once the court finally issues their opinion and doesn't properly apply the southern states factors, I think that's where the abuse of discretion is, because there is no prejudice to the other side. And if you don't go through each of those factors, then I don't think you get to the proper result, ultimately, here. Your Honor. You have other issues in this case, then, get to the actual... Don't I ever. Indeed. I also want to talk about the motion in Lemonnier related to the demotion and to... Counsel, you can argue the case the way you want, but you're leading with a glass jaw. I mean, that's the hardest standard evidentiary type of what I call administrative rulings in a trial. That's probably the highest level of deference. So, do what you ought to, but you don't have 20 minutes total. Thank you. You really need to get to the essence of your cases that were summarily dismissed, but I assume you have an argument, even if all that is notwithstanding, that you still win. Thank you, Your Honor. I would try to get to that. Okay. Okay, so let me put it in fast forward, then. All right. So, even notwithstanding the motions in Lemonnier, going to the court's opinion on the summary judgment motion, we believe that there was clear error. I want to start with the evidence supporting pretext. The court did not credit any of the evidence related to pretext. That's assuming you've established a prima facie case. Correct, Your Honor. You don't jump over that one, then. Correct, Your Honor. I thought the court said you didn't do it. I think the court erred. I want to start with the FMLA claim, and let's start with the FMLA claim, because the court clearly erred on the issue of temporal proximity in the first instance. What was the time period? Tell me the time period you're talking about. She returns from FMLA leave January 26th. She's terminated February 16th. So, three weeks or so. Yes, Your Honor. You've got that temporal proximity on the other one, too. That's a longer period of time. Correct, yes. You don't want to argue that, do you? You'd be the first to argue something like that on a case like that that we've seen, so you probably don't want to argue that one, do you? I'm going to focus on this argument, Your Honor. So, as to the FMLA claim, the court said no causation because of no temporal proximity. I think the court erred in the first instance on calculating temporal proximity, because in the opinion, he says, well, Ms. Gomez told her employer that she was going to be out on disability and medical leave around December 2015. That's just inconsistent with the facts and the record. Correct. Period. Correct. Right. And so, completely disregarded are the facts, which were she returned from medical leave on February 26th, and then she's terminated a few weeks later. The court does not cite to Dotson v. Pfizer, which I think is really the on-point case that the court missed, didn't analyze it, didn't apply it. That's really the key case that should have been included in his opinion, was not. Additionally, then once you get to, you know, through that causation analysis, he didn't consider any of the pretextual arguments that we raised, which were the post hoc justifications. So this is on the retaliation claim in particular. Correct, Your Honor. That's probably one of your stronger arguments, at least in terms of the prima facie. Correct. But the pretextual thing. Totally agree. I want to know how you're going to overcome this pretextual argument here. Okay.  When she was terminated, she was told that the contract was lost, and therefore she didn't have a position anymore. Yet the two other male employees did. They found spots for them, but they didn't find a spot for her. I thought they were hired before she left. They were hired, but they hadn't yet started working. For different positions. Well, Kirk Johnson, the senior program manager for the test contract, was sent to another contract. That was before the contract was lost. Mr. Parsons was hired before the contract was lost, but they found a place for him after the contract was lost. He probably applied for it. Did Ms. Gomez apply for anything? Well, the application issue is a bit of a red herring. So no, she didn't apply for anything? She was told to go to Karen Hummer, the recruiter, and apply for something. And Ms. Hummer said, we don't have any positions for you. I don't see, from a practical aspect, how you apply for a position when the head recruiter tells you, we don't have a job for you. But, Cynthia Barreda, the president of the company, tells Mr. Parsons, we have a job for you. We can absolutely find a job for you. We've lost the contract, but we'll find a position for you. And we believe that that demonstrates that she's the odd woman out, so to speak. And she's also the odd woman out who returns from medical leave, having been a Marine Corps veteran for 20 years, suffering from a second hip surgery. She's then told... Why didn't they fire her after the first hip surgery then, if this was all about her disability, that they got rid of her? Well, they were using her veteran status, her disabled veteran status, for the test contract. And so they needed that in order to get that contract, which they ultimately lost. But that certainly doesn't negate an unlawful discriminatory act later on in the sequence of events. And I think that this was a circumstance where the court just didn't even credit it, just didn't even look at it, didn't even raise it. And I think there, that's the abuse of discretion, Your Honor. These were disputed facts, correct? Correct, Your Honor. Whether she applied, how she applied, what she was told to do, and what they said was available. That's what trials are for, right? That's right, Your Honor. It's amazing. In terms of Title VII, in those cases, it's the easiest way to say, well, we don't need trials. But these are disputed facts. Go ahead. You have anything else to say? You have... The red light is on. Yes, Your Honor. If there are no further questions... Are you going to reserve the rest of your time? Yes. I was going to let you keep it and give you 30 seconds, but that's fine. Okay. Thank you, Your Honor. Ms. Reneau? Good morning, Your Honors. I'm Meryl Reneau from Miles and Stockbridge, and I represent Haystacks International and Nexcentrics Corporation. And for ease, I will refer to them both as Nexcentrics today. I have with me the CEO and Director of Human Relations for Nexcentrics with me, Cindy Barrett and Susan Brady. Summary judgment should be entered in this case, and the motions in limine were absolutely properly granted. One issue that wasn't discussed thus far is that the district court assumed, without arguing, that it was somehow permissible for the plaintiff to base her claims upon a combination of a little bit of gender discrimination, a little bit of disability discrimination, and a little bit of FMLA retaliation. Each of which she conceded were equal parts in the reason why she contends she was termination. So a hybrid claim? It is a super combo hybrid claim, Your Honor. All of which are protected by statutes, right? Yes, but there's a different standard. And so if there's a little bit of gender discrimination, how much? She couldn't ascribe to that. So how can she show that it's but for her age, or but for her disability, or but for her FMLA leave that she would have been terminated? And the courts that have considered this, none have found a prima facie case based upon a combination subgroup alleged here. The district court suggested in footnote five that the Supreme Court has allowed claims alleging multiple forms of discrimination in Phillips v. Martin Marietta. But in Phillips v. Martin Marietta, the plaintiff did not allege multiple forms of discrimination. She claimed that there was gender discrimination as the company refused to hire women with small children, but hired men with small children. So are you complaining about what the district court did here? He pumped it, Your Honor. And we would ask this court. You're trying to get the district court to affirm. You want us to affirm this district court. And this is an additional basis for affirmance. Tell me about this retaliation claim. The attorney on the other side said that temporal causation is shown. It's only like three weeks later. Well, Your Honor, what is the protective activity here? The protective activity here was first in April of 2015. She indicated she was going on a second leave. She was terminated 10 months after that. And what is the latest protective leave that she engaged in? She went out on leave on December 1, which is three months before she was terminated. And the circuit has said that that is far too long a period of time to establish temporal proximity. But during the whole time she's out, isn't she exercising her rights? And there will be retaliation throughout. Why does she end the first day she leaves? Wouldn't it be continuous? That's the theory of it, isn't it? In fact, I'm being discreet because that's the affidavit. That is a theory. But she concedes that she engaged in protective activity when she went out on leave. She did. Which was on December 1. Is it not continuous? The leave is continuous, Your Honor. Well, then you told us three months. It's exactly three and a half weeks, as she said. Yes, Your Honor. But as we showed in our brief, that there was an intervening act that would dispel any inference of discrimination. The contract term, her job ended? Her job went away. And even this court... Speaking of her job went away, so when her job went away, can you respond to appellants' arguments that the employer was able to find positions for these other two men but not for her and they didn't have anything she could apply for? Well, with respect to the first position, Mr. Pace, he received his position. He applied for the position and received it February 8th. That was way before the contract went away. So, and she conceded that he did not take her position and that she had no idea whether he was more qualified for that position. It was a cyber position. So, Mr. Pace did not take a position that she could have held or that she should have held and he was hired before the termination of the contract. Similarly, Mr. Parsons was hired before the elimination of the position. He was offered employment in January of 2016 and... And when was the contract going to end for that person? The job position. You said... What was it? Yeah, when? You said before it ended he was given a new job. The position, the contract ended on February 16th. He was hired on January 29th. However, the test contract that Ms. Gomez was working on was on appeal at the time. And so, when Mr. Parsons came to Nexcentrics when they needed to find someone for this position and she was already on the same contract anyway at the time, Mr. Parsons required Nexcentrics to agree that if for some unknown reason the appeal was unsuccessful or the test contract went away, he would be given another position. That was the contract that was struck with Mr. Parsons. So they had no choice whatsoever to find another position for Mr. Parsons when, in fact, unfortunately, the protest was... Excuse me? You gave him that benefit. He negotiated for that benefit. We had no choice. Nobody's going to take a job on a contract that's under appeal. You have no job security. Excuse me, counsel, but that's how the other world lives. That's not discriminated against. He was not... Wait a minute. You give them... That's the whole theory of discrimination. You just said, oh, well, he negotiated his and we have to give it to him. The point is, why didn't you give it to other people? That's the question. Is it a discriminatory reason? Well, there's no indication that he was given it because of age, race, religion, for any discriminatory reason. Well, he's not going to write it down. Well, there's no evidence not written down that that was why. Well, what about the... The appellant says she was told there weren't any jobs for her. What about that? Well, she misstates exactly what was told to her. She was told she should go to recruiting and try and find a job. And recruiting said, there's nothing at your level. And what did she do? She left. She was still on payroll for the next few weeks. She didn't look for any other positions. She didn't reach out to any program managers. There's testimony in the record... She was starting her own business. She started her own business, right? Well, she already had a business of her own. Okay. But for whatever reason, she left and didn't make any effort whatsoever to reach to anyone, PM, or anyone she had a contact with in Eccentrics to see, hey, can I do anything? Can I take a lower job? Can I... Is there anything I can do? So her position was eliminated. She had not been on a contract since her last contract ended. They carried her from September 30th until February... Excuse me, March 1 of 2016. That's a long time. So it's not because of her disability. It's not because of her age. It's not because of her gender. There was no work for her at her level, at her incredibly high salary. She's one of the highest paid individuals in the company. There's no conflicting evidence on that point you're making? Absolutely. No testimony by the plaintiff here? Excuse me? No testimony by the plaintiff to the contrary of anything you just said? Not that I'm aware of, Your Honor. She made $180,000. She compares herself to someone making $132,000 at a deputy program manager level. Your Honor, the evidence in the record is clear that but for the elimination of the test contract, she would not have been terminated. She was given other contracts from time to time. There's something available. The testimony is clear that if there were a contract, they would have put her on it. There was nothing. Speak to the pretextual argument. This pretextual argument here that the Court relied upon, too. Because if you get there, you can sort of evolve and say even if it did. Well, Your Honor, with respect to pretext, it is clear that McCentric's position was absolutely consistent from day one to today, that her position was lost because of the loss of the test contract. She was told that. That's on contested fact 26. She was told that the day that she spoke to Ms. Barretta. She was given a termination memo on February 29. Exact same reasons. Ms. Barretta testified a deposition. What reasons did you have for terminating Ms. Gomez? She was on overhead waiting for the reaward of tests that we did not win. Is there any reason other than the loss of tests in terminating Ms. Gomez? No. So where does the argument come that there were shifting reasons given? They are absolutely based upon a distortion of the record. It's absolutely false. They rely on Ms. Barretta's deposition testimony at pages 82. Ms. Barretta was not asked why Ms. Gomez was terminated at that point in time. She was asked why Mr. Parsons was put in a senior biz dev position and not Mr. Pace. And they do not give her full answer. So they absolutely mistake the record. They say that she said something in her EEOC affidavit that was inconsistent. She did not. At JA 4384 in her EEOC affidavit, again, she said on February 16, 2015, Eccentrics was informed that after reevaluation by the government, it lost the test contract referred to above as the Coast Guard contract. Therefore, the contract Ms. Gomez had bid on and been performing on prior to receipt of the stop work notice was lost. Ms. Gomez was verbally notified of the loss by Steve Walker on February 16. So the record does not state any shifting pretextual reasons. We're absolutely consistent from day one until today. There's been no change in that whatsoever. With respect to the motion in limine, I would simply add that, Your Honor, again, the argument was a distortion of the record. There was no motion to compel, any personnel files that were not produced. I would say that, unfortunately, plaintiff's counsel waited until June to file a motion to compel. We timely complied and gave everything. The identifying information deficiency notice, were you given that? That was before the motions to compel, Your Honor. We complied fully. But did you do that? Did you give the identifying information address? Yes. So counsel made this up a whole? Yes. So you're saying that she misrepresented it to the court? They were given that well before their disclosure of these witnesses. And in fact, had contacted them. All of the contact information was given to them? Before their disclosure, sure. Yes, Your Honor. So did you receive a deficiency notice? Before they filed the motion to compel, yes. Okay, and what was the response to that deficiency? Did you comply with it completely? The discovery was overbroad. We went to court. The court ordered us to provide information, which we did. What was overbroad about it? Names and contacts? They asked for every single person who was terminated after they took leave, after they, throughout her entire employment at the company, regardless of when it happened, who the decision makers were, what type of leave. Did you terminate that many? You don't terminate that many. Have you terminated that many people who are on FMLA leave? That wasn't the question asked. So that's why we said it was overbroad. And the court agreed and limited the discovery. Unfortunately, they didn't file the motion to compel until June, which was one of the issues. And we timely responded to the court order when it did in fact limit the discovery requests. Her argument that we knew about these individuals is ridiculous because, yes, they were employees. We know the names of everybody. The question is, and as the scheduling order provides, you have to tell us who your witnesses are going to be in a timely fashion by a certain date. And there's also a scheduling order that says you have to provide that information in a timely fashion so that they can be deposed. None of that was done here. Moreover, Your Honor, we did an analysis. So these were people within your control. No, some of them, no. They were no longer employees, most of them. But you had the records that were the basis of their leaving. You have the records. Your Honor, some of them were terminated years before. Maybe it's a different one. When I practiced law, I was a litigator. Maybe it's different now how people practice. But the claim is, at least one of them, the ADA claim and the FMLA claim, is that you fired her because she accessed the rights to do so under the statute. And the question is, how many other people did you terminate during her employment when they were actively on leave? That's a very relevant question. That was not the question asked, and that's not what the order provided either. If the answer was, how many people did we terminate while they were on leave, it would have been one or two people, not the people that she's referring to. And why was it broader than that? How was it broader? It was anyone who was terminated at any point in time after they had taken, with no temporal proximity, leave at any point in time during their employment. And what did you urge? A time limitation? Because normally when you practice law, you say it's too broad. Let's have a temporal restriction to that. And they wouldn't agree, so we went to court, and the court opposed it. What were you urging? What was your temporal limitation? I think I had suggested, I'm going to say three months after they returned from leave. I can't remember specifically what I suggested. Three months. I mean, you know, we throw something out. The question, was it broad enough to include just any leave? Yes. Any leave? Like if I have a cold, or vacation, or just any leave? It wasn't vacation leave. It was anyone who had ever taken any medical leave. It wasn't limited to the FMLA leave? No, and in fact, one of the individuals never took FMLA leave. That she listed on the last day of employment. She wasn't even entitled to FMLA leave. So no, it wasn't limited to FMLA leave at all. And that's why you argued that it was overbroad, and the district court agreed with you ultimately. Correct. Absolutely. Are there any other questions? I see them at my yellow light. No? Well, thank you very much. I would... Thank you, Counsel. Your Honor... Because, you know, when you file these cases, you know, you're in a fight. What did you ask for? I wanted to know, what did you ask for in terms of relevant to your case on the FMLA and ADA? Okay. So... Because I want to get this straight, because the record needs to be clear about the representation. That's very important to the court. I want to know, what did you ask for? We originally had asked for medical... Disability and medical leave during... Not the entire... I don't... From, I believe, 2013 to present, which would have been last year. And the court... When we did the meet and confer, she never tried to limit it. Defendant's counsel never tried to limit it to temporal proximity, Your Honor. In fact, their responses only had to do with Cynthia Barreda. They said, we'll only produce documents related to any unlawful discrimination related to Cynthia Barreda. I couldn't agree to that. I didn't think that was fair. Hence, we had to go to the court and file the motion to compel. We didn't file the motion to compel in June. The hearing was June 9th, Your Honor. Those are the facts. And that's in the appendix, and it's in the record. Ultimately, when we got in front of Magistrate Judge Davis, he said, look, I'm going to narrow what you're going to get. Which means, I will allow you to get all contact information and identifying information and any information about employees who are terminated from 2013 to the present who are terminated within three months of returning from medical leave. That court order is in the appendix, and that is what he held. We ultimately got a supplemental production on June 21st. Was your original request limited to medical leave? Medical disability leave. It wasn't as broad as... Can you find that in the record somewhere? That's simply not my recollection, Your Honor. Sick people on sick leave or medical leave? I believe it was medical leave, but I don't have the interrogatories in front of me. But the ultimate resolution was the court narrowed it, and the parties were fine with that. So it was overbroad? It was overbroad. The appellee objected that it was overbroad? The appellee objected that it was overbroad, but their original objections, which is why we had to go in front of Magistrate Judge Davis, was because they were only going to produce documents related to Cynthia Barreda. And that wasn't a proper resolution to our concerns about the identification of other acts' witnesses. That's the reason why we ultimately went to court, not because it was overbroad as to sick leave or medical leave. I was happy to resolve that piece to it, but the Defendant's Counsel didn't want to resolve it in that respect. She only wanted to narrow it related to Cynthia Barreda. And when that argument was raised in front of Magistrate Judge Davis, he said, no, it doesn't matter. It's fine for them to investigate and to find out other acts' evidence related to a pattern and practice of discrimination within the organization. And that's what he found. And then we got a list in a supplemental filing, and it was just a list. So when you provide interrogatory requests... When you say just a list, you mean just the name? Just the name. No contact information? No contact information. So when Defense Counsel... And I want to also be clear about this. Defense Counsel says that we were contacting people. There was one person on that list that we were able to reach. No thanks to them, because I had to send out the list, and we had to go and... They didn't work for the company anymore, did they? Correct, they did not. So we had found one person that we were able to reach. But once we finally got the contact information the last week of discovery, guess what? All of that stuff was valid information. You never asked them to find anybody, did you? You just wanted information. I just wanted the information, Your Honor. That's it. That's a typical and a proper question when you're in an employee case. You got the records. I want their contact. You didn't ask them to go get an Uber for them and find them. Correct, Your Honor. If there are no other questions, I'd like to use the last 30 seconds to just briefly discuss the pretext and the post hoc justifications. When Ms. Gomez was terminated, she was told the reason for her termination was because they lost the contract, and they couldn't afford to keep her on overhead. But one of those reasons was not true, because Matt Parsons, when he received his senior account executive position, he was placed on overhead, Your Honors. Then when this case was litigated, the CFPB contract came up and became a larger issue within the context of the litigation. And that became another issue as to why Ms. Gomez was not selected for a test program manager position and ultimately not selected for a senior account executive position or any position. Also, importantly, Ms. Gomez was, they said, you're not qualified for any of these other positions. There's no other positions for you. At the time she was terminated. Then during the course of the litigation, come to find out, she was actually qualified for many positions. And notwithstanding the findings from the third-party recruiter, Kenny, who found that she was actually qualified for several, if not at least 12 positions on that list of open positions, Ms. Susan Brady, the vice president of human resources, testified that she was qualified for at least five other positions. Nothing was given to her. There were no offers, a pay reduction, replacement, putting her in some other role where she could look for alternative positions. Keep in mind, she was on overhead when she returned from medical leave. And we're not arguing an interference claim or anything related to that. What we are saying is that this issue of her being on overhead is a red herring. Because the appendix, the record is replete with employees being placed on overhead at the discretion of certain decision makers, including Cynthia Barreda, as well as Melissa Bristol, and other individuals at the organization. We believe there are post hoc justifications that the court did not even remotely credit in its opinion, and multiple facts related to pretext, Your Honor. If there are no other questions, I see I've run out of time, and I rest on the briefs. Thank you. All right. Thank you, counsel. We'll come down to recounsel and proceed to our next case.
judges: Roger L. Gregory, James A. Wynn Jr., Stephanie D. Thacker